UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ANDREA DUNGEY,

                 Plaintiff,                                       Hon. Ellen S. Carmody

v.

                                                           Case No. 1:12-cv-1190

COMMISSIONER OF
SOCIAL SECURITY,

                 Defendant.

_____/

## OPINION

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C.

§ 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim

for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under

Titles II and XVI of the Social Security Act. On February 12, 2013, the parties agreed to proceed

in this Court for all further proceedings, including an order of final judgment. (Dkt. #13).

        Section 405(g) limits the Court to a review of the administrative record and provides

that if the Commissioner's decision is supported by substantial evidence it shall be conclusive. The

Commissioner has found that Plaintiff is not disabled within the meaning of the Act. For the reasons

stated below, the Court concludes that the Commissioner's decision is not supported by substantial

evidence. Accordingly, the Commissioner's decision is **reversed and this matter remanded for**

**further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

1

**STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial

interference.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted).  This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision.  *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.


## **PROCEDURAL POSTURE**

Plaintiff was 42 years of age on her alleged disability onset date.  (Tr. 277).  She successfully completed high school and previously worked as a receptionist and medical assistant.  (Tr. 47).  Plaintiff applied for benefits on July 26, 2007, alleging that she had been disabled since December 15, 2004, due to bi-polar disorder, dissociative identity disorder, post-traumatic stress disorder (PTSD), chronic depression, chronic back pain, degenerative disc disease, "near faint syncopy," gastroesophageal reflux disease (GERD), obesity, hypertension, renal insufficiency, protein urea, lower leg cellulitis, joint pain and swelling, dehydration, incontinence, lupus, anemia, migraines, and anxiety.  (Tr. 277-87, 358).

Plaintiff's applications were denied, after which time she requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 166-276).  On February 3, 2011, Plaintiff appeared before ALJ Paul Jones with testimony presented by Plaintiff and a vocational expert.  (Tr. 57-97).  In a written decision dated March 4, 2011, the ALJ determined that Plaintiff was not disabled.  (Tr. 29-48).  The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter.  (Tr. 1-4).  Plaintiff subsequently initiated this pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

Plaintiff's insured status expired on September 30, 2010.  (Tr. 29).  Accordingly, to

be eligible for Disability Insurance Benefits under Title II of the Social Security Act, Plaintiff must establish that she became disabled prior to the expiration of her insured status. *See* 42 U.S.C. § 423; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

## RELEVANT MEDICAL HISTORY

On March 1, 2006, Plaintiff was examined by Heather Hoffman with Kalamazoo Community Mental Health Services. (Tr. 636-46). Plaintiff reported that she was currently living at "the mission," but was also "employed 20 hours/week." (Tr. 636). Plaintiff reported that she had been "sexually abused by her babysitter's son when she was in kindergarten." (Tr. 642). Plaintiff reported that at approximately age 11 or 12, she began to experience "other personalities." (Tr. 642). Plaintiff reported that she "sees and hears different personalities that live inside her." (Tr. 641). Plaintiff also reported experiencing "dissociative symptoms such as finding herself in places she cannot remember going to, with things she can't remember finding, and people who think they know her, but she doesn't remember meeting them." (Tr. 645). Plaintiff was diagnosed with: (1) post traumatic stress disorder; (2) dissociative identity disorder; and (3) major depressive disorder. (Tr. 642). Plaintiff's GAF score was rated as 37.[1] (Tr. 642). Hoffman concluded that Plaintiff "is greatly in need of counseling to address her history of abuse and issues with anxiety and depression." (Tr. 646). Accordingly, Plaintiff began participating in outpatient therapy. (Tr. 611-56).

Treatment notes dated March 1, 2007, indicate that Plaintiff "independently initiates

---

[1] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000) (hereinafter DSM-IV). A GAF score of 37 indicates that the individual is experiencing "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." DSM-IV at 34.

and participates suitably and effectively" in the following areas of functioning: (1) personal hygiene and self care; (2) self direction; (3) activities of daily living; (4) learning and recreation; and (5) interpersonal functioning. (Tr. 625). Treatment notes also indicated that Plaintiff "recently moved into an apartment" and "looks forward to owning her own home someday." (Tr. 677).

On October 24, 2007, Plaintiff participated in a consultive examination conducted by Dr. Elaine Kountanis. (Tr. 686-89). Plaintiff reported that she was "unable to work full time due to her depression." (Tr. 686). Plaintiff reported that she experienced postpartum depression in 1991 something from which she has never recovered. (Tr. 686). Plaintiff reported that she was suicidal at that time, but now "protects herself from these urges by staying away from water because drowning is her suicide plan." (Tr. 686). Plaintiff reported that she also experiences "black outs." (Tr. 686). Plaintiff reported that "she can have 1-2 [black outs] a month or go as long as 8-9 months without one." (Tr. 686). The results of a physical examination were unremarkable and the doctor reported that Plaintiff "is able to do all the orthopedic maneuvers." (Tr. 687-88).

On October 25, 2007, Plaintiff participated in a consultive examination conducted by Robert Griffith, Ph.D. (Tr. 694-97). Plaintiff reported that she is unable to work because "she gets depressed" and "has suicidal thinking." (Tr. 694). Plaintiff also reported that she experiences "black outs." (Tr. 694). Plaintiff reported that she was "currently living in an apartment" and that "this is going well." (Tr. 695). Plaintiff reported that she "has never driven," but instead "uses the bus system." (Tr. 695). Plaintiff also reported that she "has multiple personalities" which "stresses her." (Tr. 696). The results of a mental status examination were unremarkable. (Tr. 695-97). Plaintiff was diagnosed with: (1) disassociative identity disorder by history and (2) depressive

disorder, not otherwise specified. (Tr. 697). Plaintiff's GAF score was rated as 55.[2] (Tr. 697).

On January 25, 2008, Plaintiff began treatment with Dr. Stephanie Heard. (Tr. 781-84). With respect to Plaintiff's subjective allegations, the doctor reported the following:

> Patient comes with complaints of disturbed sleep with increased unwanted thoughts at night. Patient gives an example of when she was having to buy shoes for her minor son (this son is now grown) that she would ruminate on how she would buy shoes for him when she did not have money and finds herself doing the same at this point in time. She is well aware of the fact that this is not a pertinent fear, but finds that she dwells on it, in any case, and cannot stop these ruminations. She also relates having a repetitive dream that she was in the tower during 9/11. She reports decreased energy without motivation for maintaining herself or her home despite the fact that she finds herself doing repetitive cleaning of dishes and folding and refolding of towels. She additionally complains of a decrease in focus and concentration with purposeless going from one task to the next. She finds that she has the need to check doors and windows at night repeatedly because of her fears of being invaded and hurt. It is noted that this patient does have a history of abuse in the past.

(Tr. 781). Plaintiff also reported experiencing "persistent passive suicidal ideation" as well as "unformed auditory and visual hallucinations (whispers that she cannot make out and shadows)." (Tr. 781). The results of a mental status examination revealed the following:

> [Plaintiff] appears quite intelligent and relates well to me today. She appears alert and oriented to person, place and time. Her attention and concentration is decreased. Her attitude is cooperative. There is a dependent flavor as well to her cathexis.[3] There are no observed abnormal involuntary movements, tics or stereotypies.[4] Psychomotor

---

[2] A GAF score of 55 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

[3] Cathexis refers to the "investment of mental or emotional energy in a person, object, or idea." *See* Cathexis, available at http://www.merriam-webster.com/dictionary/cathexis (last visited on March 20, 2014).

[4] Stereotypy refers to the "frequent almost mechanical repetition of the same posture, movement, or form of speech (as in schizophrenia)." *See* Stereotypy, available at http://www.merriam-webster.com/dictionary/stereotypy (last visited on March 20, 2014).

activity is retarded. Mood is reported as depressed and patient appears dysthymic. Affect is constricted in range and depth, although is appropriate to content and congruent with mood. Speech is somewhat slowed with mild delay. It is, however, fully goal directed and linear and logical. There is no evidence of articulation, disturbance or dysarthria. Auditory and visual hallucinations are as above described, and could be consistent with dissociative process, rather than primary psychosis. Patient admits to passive suicidal ideation, denies homicidal ideation and her diffuse anxiety is not believed to be consistent with paranoid ideation, but rather posttraumatic preoccupation. There is no obsessive quality to her thinking. There is no halt, block or delay in her thought process. Memory appears essentially intact. There is no frank paucity of content. Judgment and insight appear to be adequate at this time. There is reference in the chart to mania in the past and this is not observed today by either affect, pressure of speech, looseness of association or grandiosity. The AIMS test[5] was negative.

(Tr. 782-83). Plaintiff was diagnosed with: (1) major depression; (2) dissociative identity disorder by history; (3) posttraumatic stress disorder; (4) severe anxiety disorder; and (5) Cluster B and C traits.[6] (Tr. 783). Plaintiff's GAF score was rated as 50. (Tr. 783). Plaintiff's medication regimen was modified. (Tr. 783-84).

Following a March 4, 2008 examination, Dr. Heard reported that Plaintiff "appears to be compliant with her medications" and exhibited "improvement in her non-verbal presentation

---

[5] The Abnormal Involuntary Movement Scale (AIMS) is an assessment to measure the presence and/or severity of tardive dyskinesia in an individual. *See* Abnormal Involuntary Movement Scale (AIMS) - Overview, available at http://www.cqaimh.org/pdf/tool_aims.pdf (last visited on March 20, 2014). Tardive dyskinesia is a side effect that a person can experience following "prolonged exposure" to certain anti-psychotic medications. *See* Tardive Dyskinesia, available at http://www.nami.org/Content/ContentGroups/Helpline1/Tardive_Dyskinesia.htm (last visited on March 20, 2014). Tardive dyskinesia is "primarily characterized by random movements in the tongue, lips or jaws as well as facial grimacing, movements of arms, legs, fingers and toes, or even swaying movements of the trunk or hips." *Id.*

[6] Personality disorders are divided into three subtypes or clusters. *See* Personality Disorders, available at http://www.hopkinsmedicine.org/healthlibrary/conditions/mental_health_disorders/personality_disorders_85,P00760/ (last visited on March 19, 2014). Cluster B and Cluster C concern "dramatic/erratic" and "anxious/inhibited" disorders, respectively. Examples of Cluster B type personality disorders include borderline personality disorder, antisocial personality disorder, narcissistic personality disorder, and histrionic personality disorder. Examples of Cluster C type personality disorders include dependent personality disorder, avoidant personality disorder, and obsessive-compulsive personality disorder. *Id.*

and the mental status." (Tr. 775-76). Plaintiff's GAF score was rated as 58. (Tr. 776). Plaintiff's medication regimen was again modified. (Tr. 776).

On May 7, 2008, Plaintiff was examined by Dr. Heard. (Tr. 773-74). Plaintiff reported that she was "feeling quite better" and rated her mood as 8 "on a 10-point scale with 10 being the best." (Tr. 773). Plaintiff denied "suicidal or homicidal ideation" and the doctor observed "no evidence of paranoid ideation." (Tr. 773). A mental status examination revealed that Plaintiff's affect was "much brighter," her mood "better," and her attention and concentration "improved." (Tr. 773). The doctor also reported that "there is no evidence of attendance to internal cues, auditory or visual hallucinations." (Tr. 773). Plaintiff's GAF score was rated as 65.[7] (Tr. 774).

On June 30, 2008, Plaintiff participated in an MRI examination of her right knee the results of which revealed "mild/moderate" degenerative changes. (Tr. 741-42). The results of a September 26, 2008 examination revealed that Plaintiff was experiencing "mild degenerative joint disease of the right knee." (Tr. 733-36). Treatment notes dated August 6, 2008, indicate that Plaintiff "goes to Community Mental Health for her psychological issues and she is doing well on that front." (Tr. 746). Treatment notes dated October 3, 2008, indicate that Plaintiff was "doing fairly well" with respect to her sleep issues since beginning use of a CPAP machine. (Tr. 745).

On December 19, 2008, Plaintiff was examined by Dr. Heard. (Tr. 763-65). Plaintiff reported that she "resumed some of her agoraphobic tendencies, as she went out of the house only three times in November." (Tr. 763). Plaintiff reported that she was experiencing "lousy energy" and reported that her mood "is about 6 on a 10-point scale, with 10 being the best." (Tr. 763). The

---

[7] A GAF score of 65 indicates that the individual is experiencing "some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 34.

doctor observed that "there may be a seasonal component" to Plaintiff's moods. (Tr. 764). Dr. Heard reported that Plaintiff's "thought content is without any evidence of psychotic disorganization" and "there is no evidence of paranoid ideation." (Tr. 764). The doctor also reported that "there is no observed attendance to internal cues, auditory or visual hallucinations." (Tr. 764). The doctor concluded that Plaintiff's "mood is decidedly dysthymic to mildly dysphoric," but that her "insight and judgment remain well adequate for continued outpatient treatment." (Tr. 764). Plaintiff's GAF score was rated as 55-60. (Tr. 765).

On February 27, 2009, Plaintiff was examined by Dr. Heard. (Tr. 988-90). The doctor noted that Plaintiff's black-out episodes "are much decreased in frequency, with the last one being in 2006." (Tr. 988). Plaintiff appeared "quite anxious" which the doctor attributed to a recent fire in an apartment complex near Plaintiff's residence. (Tr. 988-89). The doctor reported that Plaintiff "does not appear grossly paranoid or disorganized" and "there is no observed attendance to internal cues, auditory or visual hallucinations." (Tr. 989).

Treatment notes dated May 15, 2009, indicate that Plaintiff "has been doing very well." (Tr. 984). It was noted that following a recent change in Plaintiff's medication, Plaintiff "no longer has preoccupations with water or doing herself harm with it." (Tr. 984). It was also noted that Plaintiff's "anxiety in general looks much reduced." (Tr. 984). It was further noted that Plaintiff's attention and concentration were "improved" and that her affect "is definitely brighter with appropriate smiling." (Tr. 985). Plaintiff's insight and judgment were characterized as "well adequate for continued outp[a]t[ient] treatment (also seem to be improving)." (Tr. 985). Plaintiff's GAF score was rated as 60. (Tr. 985).

On July 30, 2009, Plaintiff reported that she was "working with Michigan

Rehabilitation Services to get a job." (Tr. 978). Plaintiff further reported that "when she is working, everything is fine; but, otherwise, she feels very depressed." (Tr. 978). Plaintiff's GAF score was rated as 60-65. (Tr. 980). Treatment notes dated August 25, 2009, indicate that following a recent change in her medication Plaintiff "has fewer crying spells, is better around people, and not as much stressed out." (Tr. 974). Plaintiff also reported that "her sleep has also improved." (Tr. 974). Plaintiff's mood was "improved" and her insight and judgment were characterized as "good." (Tr. 974). Plaintiff's GAF score was rated as 65. (Tr. 974).

On November 17, 2009, Plaintiff reported that she was not experiencing "any problematic psychiatric symptoms" and that "everything is working good" when she takes her medication as prescribed. (Tr. 1078). Treatment notes dated January 5, 2010, indicate that Plaintiff's condition was "currently stable." (Tr. 1074). Plaintiff's GAF score was rated as 60-65. (Tr. 1075).

On February 16, 2010, Dr. Heard completed a questionnaire regarding Plaintiff's mental impairments. (Tr. 1080-85). The doctor rated Plaintiff's abilities in 16 categories related to the "abilities and aptitudes needed to do unskilled work." (Tr. 1082). The doctor characterized Plaintiff's abilities as "limited but satisfactory" in two categories, "seriously limited, but not precluded" in six categories, and "unable to meet competitive standards" in eight categories. (Tr. 1082). The doctor reported that Plaintiff possessed "no useful ability to function" in the following areas: (1) interact appropriately with the general public and (2) travel in unfamiliar places. (Tr. 1083). The doctor reported that Plaintiff was "unable to meet competitive standards" in the following areas: (1) maintain socially appropriate behavior and (2) use public transportation. (Tr. 1083). The doctor reported that Plaintiff experienced "marked" limitations in the following areas:

(1) activities of daily living, (2) maintaining social functioning, and (3) maintaining concentration, persistence or pace. (Tr. 1083). The doctor also reported that Plaintiff suffered from a "complete inability to function independently outside the area of [her] home." (Tr. 1084). The doctor reported that on average, Plaintiff would be absent from work, as a result of her impairments, "more than four days per month." (Tr. 1085).

On March 2, 2010, Plaintiff reported her mood as 7/10 with 10 being "best." (Tr. 1071). Plaintiff reported her anxiety as 4/10 with 10 being "unbearable." (Tr. 1071). On May 27, 2010, Plaintiff reported that she was depressed and unmotivated. (Tr. 1066). It was noted, however, that Plaintiff was not taking all of her medications as prescribed. (Tr. 1066). On June 8, 2010, Plaintiff reported that her mood was 7/10 with 10 being the best. (Tr. 1063).

Treatment notes dated December 22, 2010 indicate that from December 13, 2010 through December 15, 2010 Plaintiff participated in various events and activities at Pathways, including playing Bingo and shopping. (Tr. 1104). Plaintiff reported that "she really enjoys coming to Pathways." (Tr. 1104). Subsequent treatment notes indicate that Plaintiff attended multiple events at Pathways the following week, including the "Pathways Christmas Party." (Tr. 1103). Treatment notes indicate that Plaintiff "continues to socialize well and states she is adjusting well to Pathways and enjoying meeting new people." (Tr. 1103).

At the administrative hearing, Plaintiff testified that she was attending activities at Pathways three days each week. (Tr. 71-72). Specifically, Plaintiff reported that she was learning how to use a computer and participating in arts and crafts. (Tr. 72). Plaintiff reported that she also has "helped in their corner store, passing out items that people request," performed "data entry," and "helped out in educational, helping somebody learn to read." (Tr. 72). With respect to her alleged

difficulties socializing, Plaintiff reported that she is able to speak and interact with people, but that if it becomes too crowded she simply tries "to get out of the crowd." (Tr. 73). Plaintiff also reported that the previous fall she performed a volunteer position approximately four hours a day three days a week. (Tr. 76). With respect to her issues with agoraphobia, anxiety, and dealing with people, Plaintiff reported that "only one person at a time can be serviced so that was easy for me to handle." (Tr. 77). Plaintiff reported that she performed this volunteer job for approximately two months during which time she missed work three times due to psychological issues. (Tr. 77-81). Plaintiff reported that she had recently developed friendships with "a couple of people that [she] talk[s] to on a regular basis." (Tr. 88). Plaintiff also reported that she had another friend who helped her with grocery shopping and things around the house. (Tr. 88).

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[8] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§

---

[8] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

   2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

   3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

   4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

   5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffers from: (1) obesity; (2) hypertension; (3) affective disorders, including, but not limited to, major depression, season affective disorder and bipolar disorder; (4) anxiety disorders, including, but not limited to, social phobia with agoraphobia and posttraumatic stress disorder (PTSD); (5) cluster B and C traits; and (6) dissociative identity disorder, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 31-36).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform light work subject to the following limitations: (1) she can lift 20 pounds occasionally and 10 pounds frequently; (2) she can stand/walk for two hours and sit

13

for six hours during an 8-hour workday, with normal breaks; (3) she can occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds; (4) she can occasionally stoop and can frequently balance, kneel, crouch, and crawl; and (5) she is limited to work involving simple, routine, and repetitive tasks and no public interaction. (Tr. 36).

The ALJ determined that Plaintiff could not perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Michelle Ross.

The vocational expert testified that if limited to the extent articulated in the ALJ's hypothetical question, there existed approximately 51,000 jobs in the state of Michigan which such an individual could perform. (Tr. 92-94). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined

14

by the Social Security Act.

## I.        The ALJ Properly Evaluated the Medical Evidence

As previously noted, Plaintiff's treating psychiatrist, Dr. Heard, offered the opinion that Plaintiff was limited to an extent far beyond that recognized by the ALJ. (Tr. 1080-85, 1087-93, 1247-52). Specifically, the doctor opined that Plaintiff lacked the abilities and aptitudes to perform most aspects of even unskilled work. The doctor also reported that Plaintiff possessed "no useful ability to function" or was "unable to meet competitive standards" in several areas of functioning. The doctor further reported that Plaintiff suffered from a "complete inability to function independently outside the area of [her] home" and would, on average, be absent from work "more than four days per month." The ALJ afforded "little weight" to Dr. Heard's opinions. (Tr. 45-46). Plaintiff argues that she is entitled to relief because the ALJ failed to articulate sufficient reasons for affording less that controlling weight to Dr. Heard's opinions.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into his medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, give controlling weight to the opinion of a treating source if: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record." *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 375-76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at

*2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Gayheart*, 710 F.3d at 376. Such reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." This requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* (quoting *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)). Simply stating that the physician's opinions "are not well-supported by any objective findings and are inconsistent with other credible evidence" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment. *Gayheart*, 710 F.3d at 376-77.

If the ALJ affords less than controlling weight to a treating physician's opinion, the ALJ must still determine the weight to be afforded such. *Id.* at 376. In doing so, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source,

and (6) other relevant factors. *Id.* (citing 20 C.F.R. § 404.1527). While the ALJ is not required to explicitly discuss each of these factors, the record must nevertheless reflect that the ALJ considered those factors relevant to her assessment. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007).

The ALJ articulated several reasons for affording less than controlling weight to Dr. Heard's opinions. The ALJ first considered the nature of the treatment relationship between Plaintiff and Dr. Heard as well as the frequency with which Plaintiff treated with Dr. Heard. In this respect, the ALJ accurately observed:

> The evidence indicates Dr. Heard is a treating source; however, she is not the only psychiatrist that treated claimant. The record indicates that on numerous occasions claimant was seen by Dr. Verma. In fact, there were long stretches of time, where Dr. Heard did not have contact with claimant (Exhibit 37F). For example, Dr. Heard wrote a letter and gave a sworn statement in December 2009 (Exhibits 36F, 40F and 35F). Additionally, she filled out a Residual Functional Capacity form in February 2010 (Exhibit 38F). However, it appears, claimant had not been seen [by] Dr. Heard since May 2009 (Exhibit 32F at 11), and she was seen consistently by Dr. Verma from July 2009 through March 2010 (Exhibits 32F at 5-1, 11 and 37F at 16). Thus, at the time of Dr. Heard's December 2009 letter and statement and her February 2010 RFC, she had not treated claimant for more than six months.

(Tr. 45).

As the ALJ further observed, Dr. Heard's opinions "are not consistent with the overall objective evidence of record" including Dr. Heard's own contemporaneous treatment notes. (Tr. 45-46). As the evidence discussed above reveals, Plaintiff responded well to conservative treatment and demonstrated significant improvement when taking her medication as prescribed. In sum, the ALJ's decision to afford less than controlling weight to Dr. Heard's opinions is supported by substantial

evidence.

**II.        Plaintiff does not Meet the Requirements of a Listed Impairment**

The Listing of Impairments, detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1, identifies various impairments which, if present to the severity detailed therein, result in a finding that the claimant is disabled. Plaintiff next argues that she is entitled to relief because she satisfies the requirements of Sections 12.04 and 12.06 of the Listing of Impairments which provide:

a.        Section 12.04

12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A.        Medically documented persistence, either continuous or intermittent, of one of the following:

1.        Depressive syndrome characterized by at least four of the following:

a.        Anhedonia or pervasive loss of interest in almost all activities; or

b.        Appetite disturbance with change in weight; or

c.        Sleep disturbance; or

d.        Psychomotor agitation or retardation; or

18

e.       Decreased energy; or

f.       Feelings of guilt or worthlessness; or

g.       Difficulty concentrating or thinking; or

h.       Thoughts of suicide; or

i.       Hallucinations, delusions or paranoid thinking; or

2.       Manic syndrome characterized by at least three of the following:

a.       Hyperactivity; or

b.       Pressure of speech; or

c.       Flight of ideas; or

d.       Inflated self-esteem; or

e.       Decreased need for sleep; or

f.       Easy distractibility; or

g.       Involvement in activities that have a high probability of painful consequences which are not recognized; or

h.       Hallucinations, delusions or paranoid thinking;

Or

3.       Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

And

B.   Resulting in at least two of the following:

1.   Marked restriction of activities of daily living; or

2.   Marked difficulties in maintaining social functioning; or

3.   Marked difficulties in maintaining concentration, persistence, or pace; or

4.   Repeated episodes of decompensation, each of extended duration;

Or

C.   Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.   Repeated episodes of decompensation, each of extended duration; or

2.   A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3.   Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.04 (2011).

b.     Section 12.06

Anxiety Related Disorders:  In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A. Medically documented findings of at least one of the following:

    1.     Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

        a.     Motor tension; or

        b.     Autonomic hyperactivity; or

        c.     Apprehensive expectation; or

        d.     Vigilance and scanning;

Or

    2.     A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

    3.     Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

    4.     Recurrent obsessions or compulsions

which are a source of marked distress;
or

5.  Recurrent and intrusive recollections
    of a traumatic experience, which are a
    source of marked distress;

And

B.  Resulting in at least two of the following:

1.  Marked restriction of activities of daily living; or

2.  Marked difficulties in maintaining social functioning; or

3.  Marked difficulties in maintaining
    concentration, persistence, or pace; or

4.  Repeated episodes of decompensation,
    each of extended duration.

Or

C.  Resulting in complete inability to function
    independently outside the area of one's home.

20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.06 (2011).

The ALJ specifically analyzed whether Plaintiff satisfied either of these Listings. (Tr. 34-36). Specifically, the ALJ found that Plaintiff failed to satisfy the Part B or Part C criteria of either Listing. As the evidence discussed herein indicates, the ALJ's decision in this regard is supported by substantial evidence. Accordingly, this argument is rejected.

III.     **The ALJ Properly Discounted Plaintiff's Subjective Allegations**

At the administrative hearing, Plaintiff testified that she was unable to work due to the disabling nature of her various impairments. The ALJ found Plaintiff to be less than fully

credible and, therefore, discounted her subjective allegations. Plaintiff asserts that she is entitled to relief because the ALJ improperly discounted her subjective allegations.

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added); *see also, Grecol v. Halter*, 46 Fed. Appx. 773, 775 (6th Cir., Aug. 29, 2002) (same). As the relevant Social Security regulations make clear, however, a claimant's "statements about [his] pain or other symptoms will not alone establish that [he is] disabled." 20 C.F.R. § 404.1529(a); *see also, Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)) *Hash v. Commissioner of Social Security*, 309 Fed. Appx. 981, 989 (6th Cir., Feb. 10, 2009). Instead, as the Sixth Circuit has established, a claimant's assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted). This standard is often referred to as the *Duncan* standard. *See Workman v. Commissioner of Social Security*, 105 Fed. Appx. 794, 801 (6th Cir., July 29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the severity of a claimant's

subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony"). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations to not be fully credible, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987). In fact, as the Sixth Circuit recently stated, "[w]e have held that an administrative law judge's credibility findings are virtually unchallengeable." *Ritchie v. Commissioner of Social Security*, 540 Fed. Appx. 508, 511 (6th Cir., Oct. 4, 2013) (citation omitted).

Nevertheless, "blanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence." *Minor v. Commissioner of Social Security*, 2013 WL 264348 at *16 (6th Cir., Jan. 24, 2013). Furthermore, the ALJ must "consider all objective medical evidence in the record, including medical signs and laboratory findings, where such evidence is produced by acceptable medical sources." *Id.*

There is no question that, as the ALJ recognized, Plaintiff suffers from severe impairments which impose on her significant limitations. As the ALJ concluded, however, the

24

objective medical evidence does not support the assertion that Plaintiff experiences greater physical limitations than recognized by the ALJ. As for Plaintiff's emotional impairments, the ALJ examined in detail the evidence of record concluding that Plaintiff's "activities of daily living and objective medical records are not consistent with her testimony regarding her psychiatric functioning." (Tr. 37-38). As the ALJ observed, while Plaintiff's ability to function may have been much more limited when she began treatment in 2006, the evidence reveals that Plaintiff responded well to conservative treatment, gradually experiencing a decrease in her symptoms and a much greater ability to function. In sum, the ALJ's decision to accord limited weight to Plaintiff's subjective allegations is supported by substantial evidence.

**IV.**     **The ALJ's Determination at Step V is not Supported by Substantial Evidence**

As noted above, at Step V of the sequential evaluation process the burden shifts to the Commissioner to establish by substantial evidence that there exist a significant number of jobs which Plaintiff can perform despite her impairments. In this instance, the ALJ attempted to meet his burden by questioning a vocational expert. Plaintiff argues that she is entitled to relief because the ALJ's hypothetical question to the vocational expert and the response thereto do not constitute substantial evidence on this particular issue. The Court agrees.

In his hypothetical question, the ALJ asked the vocational expert to assume, among other things, that Plaintiff was able to stand and walk "for about six hours. . .in an eight hour workday with normal breaks." (Tr. 93). In response, the vocational expert testified that there existed approximately 51,000 jobs in the state of Michigan which Plaintiff could perform her impairments notwithstanding. It was the response to this particular question that the ALJ relied upon to support

his Step V determination. In his decision, however, the ALJ expressly found that Plaintiff could stand and walk for only two hours during an 8-hour workday. (Tr. 36). Thus, the ALJ's hypothetical question to the vocational expert assumed that Plaintiff retained a greater capacity for work than the ALJ ultimately determined was the case. Accordingly, the vocational expert's response to the question she was asked does not constitute substantial evidence that there exist a significant number of jobs which Plaintiff can perform despite her impairments.

## V.        Remand is Appropriate

As discussed immediately above, the ALJ's decision in this matter is not supported by substantial evidence. While the Court finds that the ALJ's decision fails to comply with the relevant legal standards, Plaintiff can be awarded benefits only if proof of her disability is "compelling." *Faucher v. Secretary of Health and Human Serv's*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and award benefits if all essential factual issues have been resolved and proof of disability is compelling). While the ALJ's decision is not supported by substantial evidence, there does not exist *compelling* evidence that Plaintiff is disabled. In sum, evaluation of Plaintiff's claim requires the resolution of factual disputes which this Court is neither authorized nor competent to undertake in the first instance. The Court concludes, therefore, that the Commissioner's decision must be reversed and this matter remanded for further factual findings.

## <u>CONCLUSION</u>

For the reasons articulated herein, the Court concludes that the ALJ's decision is not supported by substantial evidence. Accordingly, the Commissioner's decision is **reversed and the**

**matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

A judgment consistent with this opinion will enter.


Date:  March 25, 2014                                      /s/ Ellen S. Carmody
                                                                        ELLEN S. CARMODY
                                                                        United States Magistrate Judge